*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VAAG OGANYAN and CAROLINA OGANYAN,

        Plaintiffs-Appellants,

and

SO, TO, and AO, Minors, by Next Friend VAAG
OGANYAN,

        Plaintiffs,

v

BLACK TIGER TRUCKING, LLC, and
KHOSHABA BABA,

        Defendants-Appellees.

UNPUBLISHED
January 16, 2026
2:20 PM

No. 369253
Macomb Circuit Court
LC No. 2021-001482-NI

Before: MALDONADO, P.J., and BOONSTRA and WALLACE, JJ.

PER CURIAM.

Plaintiffs, Vaag and Carolina Oganyan,[1] appeal the trial court's order granting summary disposition to defendants, Black Tiger Trucking, LLC and Khoshaba Baba, in this third-party automobile negligence action by leave granted.[2] We reverse and remand for further proceedings consistent with this opinion.

---

[1] Only Vaag and Carolina seek relief from this Court as appellants. For clarity and convenience, we refer only to them as "plaintiffs" in this opinion and only discuss their children (three of whom are plaintiffs to this action) when relevant.

[2] *Oganyan v Black Tiger Trucking, LLC*, unpublished order of the Court of Appeals, entered July 2, 2024 (Docket No. 369253).

## I. FACTUAL BASIS UNDERLYING THE LITIGATION

On October 28, 2020, at approximately 6:40 p.m., plaintiffs were driving on Interstate 40 East in Arkansas. They were driving from their home in Texas to Tennessee with three of their children to attend a hockey tournament and visit family. It was raining heavily, visibility was low, and they encountered a backup caused by a motor vehicle accident. Slowing to a stop because of this backup, plaintiffs' minivan was then rear-ended by a semi-trailer truck driven by Baba. The force of the collision propelled the plaintiffs' minivan forward into a ditch and caused its air bags to deploy. Baba was driving the Freightliner on behalf of Black Tiger at the time of the accident, transporting goods from Texas to Michigan, and the collision caused it to crash into the median cable barrier and jackknife.

As a result of the crash, plaintiffs' minivan was a total loss, i.e., it was "totaled" in the crash. Plaintiffs and their three children did not receive emergency medical attention at the scene, which was not forthcoming—emergency responders were already responding to a possibly fatal accident (that was the source of the traffic backup) and it took the police over an hour to arrive to take a report. Plaintiffs and their three children stayed in a hotel that night; finished their drive in a rental car to stay with family near Nashville the following day; and, upon arrival, all of them went to a medical center walk-in clinic for evaluation.

Vaag complained of neck pain, head injury, back pain and left knee pain at the clinic, was diagnosed with myalgia and cervicalgia,[3] and was instructed to follow-up with his primary care physician upon his return to Texas.

He testified at his deposition that he may have experienced some neck pain in the past, has had ongoing mild lower back pain and mild right hip pain for a number of years, and had meniscus repair surgery on his right knee approximately 25 years earlier, in 1994. He was diagnosed with depression and anxiety in 2003 or 2004. In 2012, Vaag was diagnosed with a "[m]ild degenerative disc and facet disease of the lower lumbar spine . . . ." However, at a February 2019 doctor's appointment, no issues were noted with Vaag's head, back, neck, or knees.

Vaag testified that he was rattled and his brain was in a fog on both the night of the accident and the following night, his neck and back pain "started to kick in" more on the third night, and the fourth and fifth nights were "just pain." He further testified that the pain in his right knee "just got horrible" once he started to walk more after the accident, and he suffered a lot of headaches. On November 18, 2020, Vaag was diagnosed with postconcussion syndrome, acute posttraumatic headaches, mild cognitive impairment,[4] and dizziness and loss of focus. Cervicalgia was again diagnosed at that time. Magnetic resonance imaging (MRI) of Vaag's lumbar spine revealed that he had herniated discs at L3-L4, L4-L5, and L5-S1; and an MRI of his cervical spine exhibited a disc osteophyte complex[5] at levels C3-C4, C4-C5, and C5-C6. Vaag's deposition testimony and

---

[3] Muscle pain and neck pain, respectively.

[4] Based in part on the results of the cognitive testing conducted by his neurologist.

[5] A condition where bone spurs or outgrowths form at the edges of vertebrae.

medical records reflect post-accident medical treatment that includes physical therapy; a steroid injection in his right knee, neck and two in his lower back from January-April 2021; as well as a bilateral nerve block of his trigeminal nerve at the base of his skull in May 2021. In November 2021, Vaag had a surgery on his right knee, with post-surgical diagnoses of "right knee loose body and chondromalacia and complex lateral meniscal tear."[6] On December 7, 2022, Vaag complained of daily pain in his left knee. An MRI showed meniscal tearing that required surgical repair, but it is unclear from the record whether this left knee surgery has occurred.

At the clinic on the day following the October 28, 2020 collision, Carolina complained of back pain, a stiff neck, headache, chest pressure, and "muscle aches all over." She was diagnosed with acute whiplash and instructed to take ibuprofen for pain.

A medical record review in a defense medical examination[7] report for Carolina summarizes notes of a physician's assistant at a 2016 yearly physical in which she discloses being under a lot of stress, and having upper back and shoulder pain and headaches, but the record is otherwise devoid of medical records reflecting complaints of neck, back or head pain from before the subject collision.

On November 18, 2020, she was diagnosed with a concussion with loss of consciousness and sequela, dysthymic disorder,[8] mild cognitive impairment, insomnia, acute posttraumatic headaches, diffuse traumatic brain injury (TBI) and sequela, and visual disturbances. Cervicalgia, low back pain, and radiculopathy in the lumbar region were also diagnosed at that time. At her March 2022 deposition, Carolina complained of lower back pain, sciatica in her right leg, frequent headaches, neck pain and pain in her right breast, as well as vision problems that developed immediately following the accident (for which she has had three sets of corrective lenses made that still have not corrected her vision), all of which she attributes to the subject collision. She testified that she has needed to wear glasses ever since the accident (whereas before the accident, she said she only needed them on long distance drives). According to Carolina, her vision was blurry following the accident and she could not read.

Medical records disclose that Carolina treated for neck and back pain following the subject collision and subsequent MRIs exhibited a herniated disc at L5-S1 and a bulging disc at L4-L5.

---

[6] Chondromalacia is a deterioration and softening of the cartilage in the knee.

[7] Although the parties refer to "independent medical examinations" or "IMEs," "that appellation is a euphemistic term of art." *Micheli v Mich Auto Ins Placement Facility*, 340 Mich App 360, 364 n 3; 986 NW2d 451 (2022). In reality, "an IME involves obtaining a second opinion from a doctor who is entirely selected and paid for by an insurance company, rendering the 'independence' of the examination somewhat questionable." *Id*. Accordingly, this opinion will refer to the medical examinations defendants ordered in this litigation as "defense medical examinations" or "DMEs." See, e.g., *Muci v State Farm Auto Ins Co*, 478 Mich 178, 182; 732 NW2d 88 (2007).

[8] A mild form of depression that has lasted for at least two years at the time of diagnosis. See Johns Hopkins Medicine, *Dysthymia* <https://www.hopkinsmedicine.org/health/conditions-and-diseases/dysthymia> (accessed September 16, 2025).

She received physical therapy for her neck and back pain and chiropractic care for her neck pain. She also suffered from anxiety due to the crash and underwent therapy to address it. Records from a May 26, 2021 medical appointment indicate Carolina referenced the October 2020 collision and that she has been seeing a specialist for her resulting headaches and back pain, "but states that she is doing well and denies any concern about this today." She was not actively receiving any medical treatment in 2022. Regarding her ongoing back pain, Carolina testified at her deposition that:

> I've learned to manage it. So if I'm not doing the activity [that causes me pain], I'm not going to have the [pain]. So does that mean it[']s gotten better? No. Because if I do those activities, I'm going to be in pain.

> So is it the same? Possibly. It[']s probably the same. I just have to decide okay, should I go for a run and risk it or work out and risk it?

> So I can't answer that question. I don't know how to answer it rightfully.

Plaintiffs each testified at their depositions that their lives changed significantly following the accident due to the impairments they sustained. Before the accident, the Oganyan family would drive long distances to hockey tournaments, vacation or to visit family and friends, but afterwards this family travel has been significantly limited, and they either do not travel, fly, do not travel together, or only attend local events.

Carolina testified that she now has anxiety and panic attacks about driving or even being a motor vehicle passenger. She is additionally unable to focus on her work and it affects her productivity at work (which she expects to result in lower bonuses due to lower production). She can no longer run continuously[9] and is limited in her ability to take care of her chickens and garden (which are two of her favorite recreational activities) because of the severe pain she suffers after doing so. She is irritable and argues with Vaag because things need to be done around the house (such as yardwork and trimming trees on their property), but he can no longer do them due to the pain he would likewise endure as a result of the injuries he sustained in the subject collision, and this causes ongoing emotional strain. Carolina has additionally had to stop home-schooling her children due to her ongoing vision problems from the collision.

Vaag testified that, as a result of the impairments he suffered from the collision, in addition to his inability to participate in and enjoy his children's recreation hockey as he once did because of issues with driving or sitting for long periods of time, he has likewise been unable to participate in his own recreational hockey due to his knee problems. While he once enjoyed yardwork and maintaining his property, he now struggles to do so due to the neck and back pain that would result, specifically mentioning that he had to hire people to trim the trees and maintain the gravel driveway. His trouble sitting for long periods of time and focusing has likewise negatively affected his productivity and ability to work, which he anticipates will ultimately have detrimental financial consequences.

---

[9] Whereas she used to regularly run 2-5 miles, now she limits that activity to a combination of walking and running for perhaps 2 miles (and still suffers pain from doing this).

## II. PROCEDURAL HISTORY

Black Tiger is a Michigan company based in Sterling Heights and Baba also resides in Michigan. On April 28, 2021, plaintiffs filed their complaint against defendants in Michigan. On April 28, 2023, defendants moved for summary disposition pursuant to MCR 2.116(C)(10). While defendants' motion recited the general law for recovery of noneconomic damages in a third-party automobile negligence case, their actual argument for summary disposition of this claim focused solely on the third prong of the test for a compensable threshold injury set forth in *McCormick v Carrier*, 487 Mich 180, 195; 795 NW2d 517 (2010), and later codified at MCL 500.3135(5): that plaintiffs could not establish a question of material fact that any asserted impairment "affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living." MCL 500.3135(5)(c); see also *McCormick*, 487 Mich at 195, 200-209. While defendants' motion did not focus on whether Vaag and Carolina could establish the first two prongs of the test for a threshold injury, i.e., that they suffered "(1) an objectively manifested impairment (2) of an important body function," they argued, generally, that plaintiffs could not prove that their injuries meet the threshold requirements of the no-fault act, i.e., MCL 500.3135(5). Defendants argued that Vaag and Carolina "continue to work without restrictions and are capable of continuing to home school their children and go to activities with them" and that they "were not disabled for any duration of time after the accident and did not require any restrictions." Defendants argued that "plaintiff's lifestyle, as evidenced by their own testimony, limited treatment, and ability to work, play sports and generally live their lives in the same manner and without ANY restrictions demonstrates that summary disposition is appropriate." (Emphasis omitted).

In response, plaintiffs argued that "[t]heir injuries easily exceed the threshold requirement as their medical treatment alone speaks volumes as to how their lives have been impacted by the crash." The response set forth plaintiffs' injuries, and provided a fourteen-page itemization of the treatment they have received for those injuries. The response attached medical records supporting the injuries and treatments received, including Vaag's 2021 surgery on his right knee, left knee pain and later diagnosis of a meniscal tear requiring surgery, ongoing pain for months after the accident, ongoing post-concussion syndrome and posttraumatic headaches for months after the accident, and injections to the right knee, back and head; and likewise including Carolina's ongoing post-concussive, neurological symptoms (including headaches, anxiety and vision issues), as well as ongoing neck and back pain, for months following the accident. Defendants filed no reply brief.

At the summary disposition motion hearing, defense counsel contended plaintiffs' claim is that, due to "threshold type injuries" they sustained, "they can't live their life in the same manner as prior to the accident, . . . the facts of this case, when looking at the objective medical evidence shows otherwise." The trial court directed defense counsel to address the concussions sustained by Vaag and Carolina in the collision. Defense counsel then claimed, based upon its neurologist's DME reports, that there was no objective finding of any neurological issues, and that the defense neurologist found no causal connection between the accident and any claim of concussion as to Vaag. Plaintiffs' counsel noted Vaag was diagnosed with concussion with mild cognitive impairment, and acute posttraumatic headache on November 18, 2020, and that Carolina had a similar diagnosis. While defense counsel claimed its expert questioned the treating neurologist's

methodology, the trial court acknowledged the question of fact created by the two physicians reaching different diagnoses.[10]

Defense counsel contended that both Vaag's and Carolina's "orthopedic and neurology [DME] reports show minimal injury that is not equivalent to a threshold injury." But evidence is viewed in the non-movant's favor, and what defense counsel may subjectively contend to be "minimal injury" does not address whether each plaintiff presents a genuine issue of material fact as to whether they suffered an objectively manifested *impairment* of an important body function or whether that impairment affects plaintiffs' general ability to lead their normal lives. *McCormick*, 487 Mich at 195; see also MCL 500.3135(5).

Plaintiffs' counsel referenced Vaag and Carolina's deposition transcripts, which were attached to defendants' motion for summary disposition, and other record evidence in arguing that each impairment each plaintiff suffered, when viewed in the light most favorable to plaintiffs, creates questions of fact on the issue of whether they meet the threshold requirements of MCL 500.3135(5)(c). Plaintiffs' counsel argued Vaag's ability to lead his normal life was affected by the impairments resulting from his concussion with cognitive impairment, neck and back injuries, and knee injuries (or aggravation of preexisting conditions), and that this was likewise the case as to the impairments resulting from Carolina's concussion with cognitive impairment, neck and back injuries (or aggravation of preexisting conditions). Vaag's concussion and cognitive impairment affected his memory, concentration, ability to sleep, and his frequent headaches were almost unbearable (9 out of 10 pain). With his right knee pain, he was barely able to walk the week before that surgery, and he limited himself to shorter distance drives and did not take the family on the long trips that were regular events before the collision because it was no longer safe, comfortable or enjoyable to do so. Further, plaintiffs' could no longer maintain their home in the manner they did prior to the accident, were having their cleaning lady come 2-3 times a month (whereas before she only came monthly) and likewise had to hire people to maintain their yard and driveway. Also, Carolina has become more easily overwhelmed and breaks down more often as a result of her concussion. Plaintiffs' counsel also noted Vaag and Carolina's deposition testimony that, due to the impairments they suffered, they were no longer able to homeschool their children (which they had done before the accident) which was a significant lifestyle change.

The trial court took the matter under advisement and subsequently issued its July 3, 2023 opinion and order granting defendants' motion for summary disposition. The trial court found:

> Plaintiffs have presented insufficient evidence to show that Vaag suffered an objectively manifested impairment of his head, as there is no diagnostic confirmation of any self-reported impairment. Although a nerve block was performed, there is no indication in the record that this was related to the motor vehicle accident. The medical records regarding Vaag's knee surgeries do relate back to the motor vehicle accident, so genuine issues of material fact remain

---

[10] No evidence was presented to support the claim that the treating neurologist's testing was not reliable and notably the defense expert diagnosed both Vaag and Carolina as having sustained "traumatic brain injury."

-6-

regarding whether Vaag's knee surgeries were objectively manifested impairments caused by the subject accident.

As to Carolina, the trial court acknowledged her medical records reflecting ongoing issues with blurry, altered vision that arose following the collision alongside acute posttraumatic headaches and that a December 1, 2020 MRI reflected "soft findings for benign intracranial hypertension." It nonetheless found that

> [w]hile Carolina did undergo an MRI which revealed some impairment in her brain, there is no indication in the record that this condition was related to the motor vehicle accident. Regarding the low back pain, diagnostic testing reflected no radiculopathy or neuropathy which could be objectively observed. With regard to Carolina's chronic neck and back pain, while objective testing reflect[s] a herniation and extrusion, there is no evidence presented showing how these conditions impaired Carolina. An injury alone is insufficient to survive summary disposition.

As to both Vaag and Carolina, the trial court dismissed any injuries or impairments for which there was any evidence of a preexisting condition, failing to consider evidence of the collision's aggravation of such preexisting condition as affecting their general ability to lead their normal lives. The trial court found plaintiffs "have presented no evidence whatsoever regarding any change in their ability to lead their normal lives. It is undisputed that Vaag and Carolina have been able to continue work without interruption . . . ." It concluded that plaintiffs had not demonstrated that they suffered a serious impairment of a bodily function, and thus, their claims were dismissed.

On July 26, 2023, plaintiffs filed a motion for reconsideration of the trial court's opinion and order, noting that it was obliged to make its decision on the entire record, and that it appears to have overlooked medical evidence regarding plaintiffs, as well as their deposition transcripts, which were attached to defendants' motion. The motion itemized many ways in which the plaintiffs' deposition transcripts evidence how the impairments they suffered affected their general ability to lead their normal lives. This included Vaag now being unable to maintain his yard, participate in recreational hockey, and post-concussive disorder issues with memory, mood swings, focus, and headaches. It further included Carolina now being unable to take care of her chickens and garden or homeschool her children; suffering from anxiety issues that were not present pre-crash, short-term memory issues, difficulty reading and other vision issues; and her ability to engage in recreational running being materially affected. This additionally included the entire family now missing out on children's hockey tournaments and vacation and other travel that they used to attend together via long drives. With regard to objectively manifested impairments, in addition to Vaag's knees, the motion additionally noted that the record shows plaintiffs suffered concussions as a result of the crash, and whether those neurological injuries rose to the level of a serious impairment of body function presented a fact question for the jury's resolution.

The trial court denied plaintiffs' motion for reconsideration, stating they "presented evidence which suggests that, at most, they have concussions," and yet found that this does not support their claims that their head injuries were objectively manifested. As to the third prong of the serious impairment analysis, it acknowledged plaintiffs' deposition testimony reflecting

-7-

"changes attributable to the accident," but that it was "not sufficient to overcome the lack of evidence regarding objectively manifested impairments." Plaintiffs' appeal followed.

## III. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *El-Khalil v Oakwood Healthcare Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019). A motion under MCR 2.116(C)(10) examines the factual sufficiency of a claim. *Id.*

Under MCR 2.116(G)(3), "[a]ffidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required (a) when the grounds asserted do not appear on the face of the pleading or (b) when judgment is sought based on subrule (C)(10)."

> A motion under subrule (C)(10) must specifically identify the issues as to which the moving party believes there is no genuine issue as to any material fact. When a motion under subrule (C)(10) is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, judgment, if appropriate, shall be entered against him or her. [MCR 2.116(G)(4).]

If a party moving under MCR 2.116(C)(10) fails to properly present or support its motion for summary disposition, the nonmoving party has no duty to respond and the trial court should deny the motion. See *Meyer v Center Line*, 242 Mich App 560, 575; 619 NW2d 182 (2000); MCR 2.116(G)(4).

When reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a court must examine the pleadings, affidavits, depositions, admissions, and any other documentary evidence submitted by the parties and, considering both direct and circumstantial evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, determine whether a genuine issue of material fact exists. MCR 2.116(G)(5); *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999); *Libralter Plastics, Inc v Chubb Group of Ins Cos*, 199 Mich App 482, 485-486; 502 NW2d 742 (1993).

A (C)(10) motion for summary disposition may only be granted if there is no genuine issue of material fact. *El-Khalil*, 504 Mich at 159. There is a genuine issue of material fact when "the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

## IV. ANALYSIS

Plaintiffs contend the trial court erred in holding, as a matter of law, that neither of them sustained serious impairment of body function as a result of their minivan being rear-ended by the semi-trailer truck and granting summary disposition to defendants pursuant to MCR 2.116(C)(10). We agree.

-8-

Michigan's no-fault act, MCL 500.3101 *et seq.*,[11] allows for insured people to recover from their insurers for certain economic losses caused by motor vehicle accidents, regardless of fault. *McCormick*, 487 Mich at 189. This act also limits tort liability. *Id.* Liability for noneconomic losses arising out of the "ownership, maintenance or use of a motor vehicle" is limited to when the "injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." MCL 500.3135(1). "[S]erious impairment of body function" is defined as an impairment that meets the following three requirements:

(a) It is objectively manifested, meaning it is observable or perceivable from actual symptoms or conditions by someone other than the injured person.

(b) It is an impairment of an important body function, which is a body function of great value, significance, or consequence to the injured person.

(c) It affects the injured person's general ability to lead his or her normal life, meaning it has had an influence on some of the person's capacity to live in his or her normal manner of living. Although temporal considerations may be relevant, there is no temporal requirement for how long an impairment must last. This examination is inherently fact and circumstance specific to each injured person, must be conducted on a case-by-case basis, and requires comparison of the injured person's life before and after the accident. [MCL 500.3135(5).]

An objectively manifested impairment "is evidenced by actual symptoms or conditions that someone other than the injured person would observe or perceive as impairing a body function." *McCormick*, 487 Mich at 196. When considering this first prong of the serious impairment analysis, the focus is on "whether the *impairment* is objectively manifested, not the *injury* or its symptoms." *Id.* at 197. For a plaintiff's impairment to be objectively manifested, there must be "evidence establishing that there is a physical basis for their subjective complaints of pain and suffering." *Id.* at 198 (internal quotations marks and citation omitted). Medical testimony is generally, but not always, required to show an objectively manifested impairment. *Patrick v Turkelson*, 322 Mich App 595, 607; 913 NW2d 369 (2018).

"[T]o 'affect' the person's 'general ability' to lead his or her normal life is to influence some of the person's power or skill, i.e., the person's capacity, to lead a normal life." *McCormick*, 487 Mich at 201. This is a subjective, person-specific analysis that examines what a normal life was for the person who was injured. *Id.* at 202. Their ability to live their normal life must only be affected, not completely destroyed. *Id.* There is no requirement that the impairment last a certain period of time. *Patrick*, 322 Mich App at 607. "[T]here is no quantitative minimum as to the percentage of a person's normal manner of living that must be affected." *McCormick*, 487 Mich at 203.

---

[11] The no-fault act was modified extensively in 2019. All cited portions of the no-fault act are current.

The issues of whether the injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:

> (i) There is no factual dispute concerning the nature and extent of the person's injuries.

> (ii) There is a factual dispute concerning the nature and extent of the person's injuries, but the dispute is not material to the determination whether the person has suffered a serious impairment of body function or permanent serious disfigurement. [MCL 500.3135(2)(a).]

The Legislature additionally created a provision addressing situations where a plaintiff has sustained a closed-head injury, providing:

> However, for a closed-head injury, a question of fact for the jury is created if a licensed allopathic or osteopathic physician who regularly diagnoses or treats closed-head injuries testifies under oath that there may be a serious neurological injury. [MCL 500.3135(2)(a)(ii).]

But the language of section 3135 does not indicate that this "closed-head injury exception" is the only manner in which a plaintiff who has suffered a closed-head injury may establish a question of material fact precluding summary disposition. *Churchman v Rickerson*, 240 Mich App 223, 232; 611 NW2d 333 (2000). As *Churchman* explains, "[i]n the absence of an affidavit that satisfies the closed-head injury exception, a plaintiff may establish a factual question under the broader language set forth in subsection 3135(2)(a)(i) and (ii)." *Id*. (noting that "a trial court cannot determine whether a plaintiff has suffered a serious impairment of body function and enter judgment in favor of a defendant as a matter of law without first making the factual findings required under subsections 3135(2)(a)(i) or (ii)"). Accordingly, if there is a dispute about the "nature and extent" of a plaintiff's closed-head injury and if that dispute is material to the determination of if they suffered a serious impairment of body function, this establishes a factual question regarding a closed-head injury in the absence of an affidavit that satisfies the closed-head injury exception. *Id*.

In its opinion and order, the trial court found that the parties "did not dispute the nature and extent of [plaintiffs'] injuries." On the contrary, defendants' motion, by way of the orthopedic and neurologic DMEs of both plaintiffs and otherwise, contended that both Vaag's and Carolina's "orthopedic and neurology [DME] reports show minimal injury that is not equivalent to a threshold injury"; contended that many of plaintiffs' asserted injuries were preexisting in nature, unrelated to the accident (such as Vaag's left knee injury), or both (such as Vaag's right knee, back and neck injuries and Carolina's back and neck injuries); and they likewise failed to acknowledge or address any aggravation of such injuries to the extent such injuries may in fact have been preexisting. Also, defendants contended plaintiffs' neurological injuries, including concussions, were not causally connected to the accident and were not objectively manifested. Accordingly, viewing the facts concerning the nature and extent of plaintiffs' injuries in their favor we look to whether the disputes are material to whether they have suffered a serious impairment of body function.

If there is a material factual dispute regarding the nature and extent of the person's injuries, the court should not decide the issue as a matter of law. Notably, the disputed fact does not need to be outcome determinative in order to be material, but it should be "significant or essential to the issue or matter at hand." [*McCormick,* 487 Mich at 193-94, quoting Black's Law Dictionary (8th ed.) (defining "material fact").]

## A. OBJECTIVELY MANIFESTED IMPAIRMENTS

Plaintiffs argue that the trial court should not have considered whether their impairments were objectively manifested because defendants did not argue this first prong of the serious impairment analysis as a basis for summary disposition in their motion. A review of defendants' brief confirms that most of the analysis contained therein is devoted to defendants' argument regarding the third prong of the statute. However, defendants did, in fact, rely upon MCL 500.3135 as a whole, i.e., they argued that plaintiffs' respective "injuries [sic: impairments] do not rise to the statutory threshold required by MCL []500.3135." That said, we need not decide whether that extremely general argument was sufficient to provide notice to plaintiffs that the first prong of the statute would be a basis on which defendants were seeking summary disposition from the trial court, because we find that ample evidence was presented to the trial court establishing a genuine issue of material fact as to whether plaintiffs each suffered objectively manifested impairments.

Again, the trial court found that Carolina failed to establish any genuine issue of material fact with regard to whether she sustained any objectively manifested impairment from the subject collision. It also found Vaag had not shown a genuine issue of material fact as to objectively manifested impairments related to the head, neck and back injuries he sustained, but that there was a material fact question whether his right and left knees each demonstrated objectively manifested impairments caused by the subject accident.

The trial court found the impairment to Vaag's right knee was objectively manifested by a statement of medical necessity for surgery thereon by Kyle Stuart, MD stating that Vaag had pain and dysfunction for twelve months following the collision, which failed to improve with conservative non-operative management. Further, after his right knee surgery, Vaag's diagnoses were "right knee loose body and chondromalacia and complex lateral meniscal tear." As to his left knee, the trial court noted a Foundation Physicians Group note recommending arthroscopy for meniscal tearing, which observed that Vaag complained of pain at the medical center walk-in clinic the day following the accident and "the pain has progressively gotten worse over the past two years to the point of daily pain and instability as well as mechanical signs" and "the patient cannot squat without significant pain, cannot walk stairs."

Regarding Vaag's back and neck issues, we note that he likewise complained of this pain at the walk-in clinic the day following the accident, and continued to indicate he has been "having constant neck and back pain" since that time, with radiation of pain down to his feet, and no relief provided by lumbar epidural steroid injections administered on February 25, 2021 and April 15, 2021 and a cervical epidural steroid injection on March 18, 2021. He candidly admitted that he may have experienced some neck pain in the past, had ongoing mild lower back pain for a number of years (for which he was not under any active treatment prior to the subject accident), and he was diagnosed with a "[m]ild degenerative disc and facet disease of the lower lumbar spine" in

2012. However, at a February 2019 doctor's appointment, no issues were noted with Vaag's head, back, neck, or knees. MRIs conducted after the accident confirmed herniated discs at L3-L4, L4-L5, and L5-S1; impinged nerve roots at L4, L5, and S1; and a disc osteophyte complex at levels C3-C4, C4-C5, and C5-C6. Although his doctor recommends operative intervention to his lumber spine, the record reflects that he has thus far declined it. At a July 8, 2021 evaluation, Vaag could only walk or stand for 5 minutes before needing to rest due to constant back pain that radiates to his legs and bottom of his left foot and he had problems with balancing and tripping. The DME claimed these were degenerative changes, and that Vaag suffered "lumber and cervical strain or sprain" for which typical treatment would be six to eight weeks of physical therapy and medications. However, contrary to the trial court ruling, properly viewing this evidence in the light most favorable to the non-movant, the neck and back pain arising just after the rear-end collision resulting in an inability to walk or stand for more than 5 minutes at a time and balance and tripping issues, establishes questions of material fact as to the origin of Vaag's impairment, and aggravation of the preexisting, previously asymptomatic neck and back conditions. "[T]he aggravation or triggering of a preexisting condition can constitute a compensable injury." *Fisher v Blankenship*, 286 Mich App 54, 63; 777 NW2d 469 (2009), citing *Wilkinson v Lee*, 463 Mich 388, 394-395; 617 NW2d 305 (2000).

We disagree with the trial court and find that, viewing the direct and circumstantial evidence in the non-movant's favor, there is a question of material fact whether Vaag suffered an objectively manifested impairment of his head and brain. In the November 18, 2020 neurology examination, Vaag was diagnosed as having suffered a concussion with a loss of consciousness for 30 minutes or less and meeting the criteria of post-concussion syndrome, acute posttraumatic headaches, and a mild cognitive impairment diagnoses. This assessment was based in part on Vaag having a Montreal Cognitive Assessment score of 25/30, where a score of 18-25 points typically suggests mild cognitive impairment and a score of 26-30 points typically suggests normal cognitive performance.[12] Additionally, following months of acute posttraumatic headaches that first manifested shortly after the subject collision, Vaag was administered a bilateral trigeminal nerve block injection at the base of his skull. The May 6, 2021 procedure note assessed the primary purpose of the procedure was to address sequela of his concussion with loss of consciousness, i.e., his post-concussion syndrome, ongoing acute posttraumatic headaches and mild cognitive impairment.

In denying their motion for reconsideration, the trial court rejected plaintiffs' reliance on *Orvis v Moore*, unpublished opinion of the Court of Appeals, issued December 22, 2022 (Docket No. 358646), finding the present case's facts were distinguishable from *Orvis*'s finding that documents from medical providers who diagnosed that plaintiff with "closed-head injury, concussion, and post-concussion syndrome" were sufficient to demonstrate objectively manifested impairment. However, we do not perceive any meaningful basis for distinguishing Vaag's

---

[12] <https://mocacognition.com/faq/> (accessed September 16, 2025).

evidence from what was present in *Orvis* and are persuaded by that decision's reasoning.[13] Specifically, this Court stated in *Orvis*:

> Although plaintiff did not present medical testimony establishing a closed-head injury diagnosis, she submitted to the trial court documents from various medical providers who diagnosed her with a closed-head injury, concussion, and post-concussion syndrome. Such documentation demonstrated the existence of a genuine issue of material fact regarding whether plaintiff sustained an objectively manifested impairment. [*Orvis*, unpub op at 4-5, citing *McCormick*, 487 Mich at 198; MCL 500.3135(2).]

Likewise, in the instant case, record evidence establishes that a medical provider diagnosed him with a closed head injury and concussion, which establishes another genuine issue of material fact as to whether he sustained an additional objectively manifested impairment as a result of his brain injury.

We likewise find a question of material fact as to whether Carolina suffered an objectively manifested impairment of her head and brain function based on her "actual symptoms [and] conditions that someone other than the injured person would observe or perceive as impairing a body function," including the evidence of concussion-related vision issues. *McCormick*, 487 Mich at 196. The medical evidence included the November 18, 2020 neurology examination, wherein Carolina was diagnosed as having suffered a concussion with loss of consciousness and sequela, a mild cognitive impairment, insomnia, acute posttraumatic headaches, a diffuse TBI and sequela, and visual disturbances, among other conditions.

## B. ABILITY TO LEAD A NORMAL LIFE

Turning to whether plaintiffs' general ability to lead their normal lives have been affected by the respective impairments of body function they sustained, we find that the deposition testimony of plaintiffs, as well as the medical record evidence contained in the lower court record, when considered as a whole, create questions of material fact. As indicated in earlier sections of this opinion, Vaag presented extensive testimony about the affect these impairments had upon his ability to lead his normal life, including the above referenced memory, concentration, and sleep issues, having to spend time suffering through chronic headaches, being barely able to walk prior to surgery, his inability to drive long distances or take his family on their normal travels, being unable to squat, having difficulty with stairs, being unable to sit for extended periods of time, being unable to participate in recreational hockey, and the issues with house maintenance (both inside and outside of the home). As for Carolina, she likewise suffered from an inability to perform the household maintenance described above, suffered from breakdowns, could no longer run continuously, was unable to perform activities without blurry vision (and had to start wearing glasses at all times), was unable to read, had difficulty focusing, and was unable to homeschool

---

[13] Unpublished decisions of this Court are not binding under the rule of stare decisis, but may still be considered as having instructive or persuasive value. *Youmans v Charter Twp of Bloomfield*, 336 Mich App 161, 217; 969 NW2d 570 (2021), citing MCR 7.215(C)(1).

her children. All of that testimony should have been considered by the trial court in ruling on the motion for summary disposition. MCR 2.116(G)(5).

In addition, plaintiffs rely upon medical record evidence demonstrating that they underwent extensive treatment as a result of their injuries. The record before us demonstrates that, after the accident, Vaag spent a significant amount of time attending a large number of medical appointments, attending physical therapy, and undergoing testing and diagnostic studies. Likewise, Carolina's records show that she likewise spent a significant amount of time after the accident attending rehabilitation, undergoing testing and diagnostic studies, as well as other medical appointments. Because the evidence indicates that their normal lives, prior to the accident, did not include devoting such a significant amount of time to attending medical appointments, their extensive time spent doing so must be considered when determining whether each plaintiff's general ability to lead his or her normal lives was affected by their impairments. Thus, the fact that plaintiffs had to rearrange so much of their lives to attend this treatment should have been considered by the trial court.

Considering this evidence as a whole, as to each plaintiff, genuine issues of material fact exist as to whether the respective impairments that they suffered as a result of the accident affected their general ability to lead their normal lives.

## V. CONCLUSION

We find that there are factual disputes concerning the nature and extent of the plaintiffs' respective injuries that are material to the determination whether each of them has suffered a serious impairment of body function. MCL 500.3135(2)(a). Thus, we find that the trial court erred by granting defendants' motion for summary disposition. Accordingly, we reverse the trial court's grant of summary disposition for the reasons stated herein and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Allie Greenleaf Maldonado
/s/ Randy J. Wallace

-14-